## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**LUXER CORPORATION,**

    **Plaintiff,**

**v.**

**PARCEL PENDING, INC.,**

    **Defendant.**

**Court No. 1:24-cv-00604-JCG**

## <u>OPINION AND ORDER</u>

This matter involves patent infringement claims filed by Luxer Corporation ("Plaintiff" or "Luxer") against Parcel Pending, Inc. ("Defendant" or "Parcel Pending"), alleging infringement of U.S. Patent Number 11,625,675 ("'675 Patent") (D.I. 1-1).  Compl. (D.I. 1).  Parcel Pending filed Defendant Quadient, Inc.'s Motion to Dismiss Luxer's Complaint, joining in its entirety the motion to dismiss filed by Package Concierge in the parallel case <u>Luxer v. Package Concierge</u>, Case No. 1:24-cv-00603.[1]  Def.'s MTD Luxer's Compl. ("Defendant's Motion to Dismiss" or "Def.'s MTD") (D.I 11); Def's MTD at Ex. 1 ("Def.'s Br.") (D.I. 11-1); <u>see</u> Def.'s MTD Pursuant Fed. R. Civ. Proc. 12(b)(6), Case No. 1:24-

---

[1] Defendant contends that Parcel Pending, Inc. was terminated in 2022 by a merger with Quadient Inc.  Def.'s MTD Luxer's Compl. at 1.  No motion has been made to substitute Defendant or to change the case style.  Fed. R. Civ. Proc. 25(c).

cv-00603 (D.I 15); Mem. Supp. Def.'s MTD Pursuant Fed. R. Civ. Proc. 12(b)(6),

Case No. 1:24-cv-00603 (D.I. 16).  Plaintiff filed Luxer's Opposition to

Defendant's Motion to Dismiss and its response to the motion to dismiss filed in

Case Number 1:24-cv-00603.  Pl.'s Opp'n Def.'s MTD (D.I. 13); Pl.'s Opp'n

Def.'s MTD at Ex. A ("Pl.'s Br.") (D.I. 13-1); see Luxer's Opp'n Package

Concierge's MTD, Case No. 1:24-cv-00603 (D.I. 18).  Defendant filed Quadient's

Reply in Support of Motion to Dismiss Plaintiff Luxer Corporation's Complaint.

Def.'s Reply Supp. MTD Pl.'s Compl. (D.I. 14).  For the reasons discussed below,

Parcel Pending's Motion to Dismiss is granted.

## BACKGROUND

Luxer is a Delaware company that makes products to "automat[e] package

delivery, storage, and retrieval."  Compl. ¶ 9.  In 2015, Luxer began offering the

"Luxer Room," a system for controlling access to a package storage room.  Id.

¶ 11.  The Luxer Room allows package carriers to access a package storage room

using an access code.  Id.  When a package is ready for retrieval, recipients are

notified via text message and provided with a single use access code to access the

package storage room.  Id.  The Luxer Room is monitored by video surveillance

and maintains access logs.  Id.

Luxer is the owner by assignment of the entire right, title, and interest in and

to the '675 Patent, titled "Method and system for controlling a storage room."  Id.

¶¶ 3, 12.  The '675 Patent was issued on April 11, 2023 and "is generally directed

to a system and a method for controlling electronic locks for locking a door of a

storage room that is part of a building."  Id. ¶ 12; '675 Patent Abstract.  The patent

describes a system in which a lock interface determines whether the credentials of

a person attempting to access a package storage room are authentic.  '675 Patent at

Fig. 5, 19:60–20:67.  If the request for access is determined to be valid, a signal is

sent to an electronic lock to allow access to the package storage room.  Id. at Fig.

5, 19:60–20:67.  If the request is determined to be invalid, the electronic lock does

not disengage and the user is informed that the request to enter the package storage

room has been denied.  Id. at Fig. 5, 20:38–42.

Parcel Pending began in 2021 to offer its Package Room Solutions.  Compl.

¶¶ 14–15.  Parcel Pending describes its Package Room Solutions as "A Secure

Room with Controlled Access."  Id. at ¶ 17.  It features "'Simple Delivery,' where

couriers deliver packages directly to package rooms using their unique access

code."  Id. ¶ 16 (internal citation and quotations omitted).  The rooms also feature

"'Monitored Access,' where the resident receives a unique access code to enter and

retrieve their packages."  Id. (internal citation and quotations omitted).

Defendant's Package Room Solutions is described "as being 'Versatile,' with

100% deliverability for multiple package sizes and delivery types."  Id. (internal

citation and quotations omitted).  Defendant describes the operation of the room as:

> Couriers deliver packages directly into a secure room using their unique access code. Residents are immediately notified and are provided an individual access code to enter and pick up their package(s)—no waiting at the leasing office or scheduling secondary deliveries required. The package room also includes a camera at the touchscreen and 24/7, secure, cloud-based video surveillance for added security.

Id. at ¶ 17 (internal citation omitted).

Luxer filed this action alleging infringement of the '675 Patent and seeking injunctive relief and monetary damages. Compl. Parcel Pending filed its Motion to Dismiss arguing that the '675 Patent's claims are ineligible for patent protection under 35 U.S.C. § 101. Def.'s MTD. Oral argument was held on Parcel Pending's Motion to Dismiss on December 16, 2024.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that pleadings contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. Proc. 8(a)(1). If pleadings fail to state a claim, in whole or in part, on which a court may grant relief, a defendant may seek to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6). Fed. R. Civ. Proc. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." Id.  Plausibility requires "more than a sheer

possibility that a defendant has acted unlawfully." Id.  In considering a motion to

dismiss, the Court must assume the factual allegations contained in the complaint

to be true and draw all reasonable inferences in favor of the non-moving party.

Twombly, 550 U.S. at 555–56.  However, "[t]hreadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice" to state

a claim.  Iqbal, 556 U.S. at 679.

     In patent infringement cases, allegations of infringement are governed by the

Iqbal/Twombly pleading standard.  Golden v. Apple Inc., 819 F. App'x 930, 930–

31 (Fed. Cir. 2020).  There must be some factual allegations that, when taken as

true, articulate why it is plausible that the accused product infringes the patent

claim.  Bot M8 LLC v. Sony Corp., 4 F.4th 1342, 1353 (Fed. Cir. 2021).

## DISCUSSION

     Parcel Pending moves to dismiss the lone claim of patent infringement,

arguing that the '675 Patent's claims are directed at a subject matter that is

ineligible for patent protection under 35 U.S.C. § 101.  Def.'s MTD; Def.'s Br. at

1–2.

     35 U.S.C. § 101 makes patentable "any new and useful process, machine,

manufacture, or composition of matter, or any new and useful improvement

thereof." 35 U.S.C. § 101. This broad provision has an important exception: "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." Alice Corp. Pty. Ltd. v. CLS Bank Int'l ("Alice"), 573 U.S. 208, 216 (2014). The purpose of these exceptions is to protect the "basic tools of scientific and technological work." Mayo Collaborative Servs. v. Prometheus Labs., Inc. ("Mayo"), 566 U.S. 66, 71 (2012). Eligibility "is a question of law" with "underlying questions of fact." Simio, LLC v. FlexSim Software Prods., Inc., 983 F.3d 1353, 1358–59 (Fed. Cir. 2020).

In Alice Corporation Pty. Ltd. v. CLS Bank International, 573 U.S. 208 (2014), the U.S. Supreme Court reaffirmed the two-step framework set forth in Mayo Collaborative Services v. Prometheus Laboratories, Inc., 566 U.S. 66 (2012), for distinguishing patents that claim ineligible subject matter from those that claim patent-eligible applications of those concepts. Alice, 573 U.S. at 217. In step one, the court must determine whether the claims are drawn to a patent-ineligible concept, such as an abstract idea. Id. To do so, the court examines the focus of the claim and its character as a whole. SAP Am., Inc. v. InvestPic, LLC, 898 F.3d 1161, 1167 (Fed. Cir. 2018).

If the claims are drawn to an abstract idea at step one of the analysis, the court then turns to step two to examine "the elements of each claim both individually and as an ordered combination" to see if there is an "inventive

concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." Alice, 573 U.S. at 217–18 (internal quotations omitted). "A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." Id. at 221 (internal quotations omitted). Such "additional features" are not enough to constitute an inventive concept if they are "well-understood, routine, conventional activities." Id. at 225. To transform an unpatentable concept into a patent-eligible application, "one must do more than simply state the [ineligible concept] while adding the words 'apply it.'" Mayo, 566 U.S. at 72.

## I.    Representative Claim

Parcel Pending contends that the Court should treat Claim One as representative of all of the '675 Patent claims for purposes of determining patent eligibility. Def.'s Br. at 6–7. Defendant argues that Claim One is "substantially similar to the remaining claims and linked to the same abstract idea of authorizing access to a secure location upon verification of a user's credentials." Id. at 6. Luxer counters that treating Claim One as representative would fail to account for the specific requirements of the remaining claims and that those claims recite both physical components and functional requirements that constitute patent-eligible subject matter. Pl.'s Br. at 16.

A court may limit its analysis of a Section 101 challenge to representative claims when the claims at issue are "substantially similar and linked to the same ineligible concept." Mobile Acuity Ltd. v. Blippar Ltd. ("Mobile Acuity"), 110 F.4th 1280, 1290 (Fed. Cir. 2024) (internal quotation omitted). Courts may treat a claim as representative "if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." See Berkheimer v. HP Inc., 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citations omitted).

The patent challenger asserting that a claim is representative of multiple claims bears the initial burden of making a prima facie showing that the group of claims are substantially similar and linked to the same ineligible concept. Mobile Acuity, 110 F.4th at 1290 (citation omitted). If a prima facie showing is made, the burden shifts to the patent owner to demonstrate why the eligibility of the purported representative claim is not decisive of the eligibility of the other claims within the identified group. Id. If the patent owner cannot make a non-frivolous argument against treating the identified claim as representative, it is precluded from arguing the eligibility of the other claims in the group. Id. (citations omitted).

Claim one of the '675 Patent recites:

A system comprising:

at least one electronic lock for locking a door of a storage room that is
stationary and part of a building. The storage room being large
enough to accommodate packages that are small, medium, and
oversized;

a lock interface that is communicatively coupled to the at least one
electronic lock, the lock interface having at least one processor
that implements one or more machine instructions stored on at
least one non-transitory computer readable medium;

wherein the one or more machine instructions, when implemented,
cause the processor of the lock interface to implement a method
including at least

receiving, at the lock interface from a terminal, a first signal
associated with a delivery, requesting access by unlocking
the door;

in response, sending from the lock interface to the at least one
electronic lock, a second signal including at least a request
to open the door;

opening the electronic lock, based on the request, and allowing
the access through the door, regardless of whether a
storage area associated with the door is in use and
regardless of whether the package is small, medium, or
oversized;

wherein the request includes at least a user identity and a code, wherein
the method further includes, after receiving the first signal
including the request,

verifying, by the lock interface, the request by authenticating the user
identity and the code received from the terminal;

approving the request, by the lock interface, after the user identity and
the code are successfully authenticated;

in response to the approving of the request, sending the second signal,
from the lock interface to the at least one electronic lock, the
second signal causing the at least one electronic lock to
automatically unlock, the at least one electronic lock including a
circuit that includes at least

> a signal input port that is communicatively connected to at least one signal output port of the lock interface;
>
> an electronic switch that, in response to the receiving of signals from the lock interface, causes electric current to flow through the at least one electronic lock:
>
> the step of verifying, by the lock interface, the request further including at least
>
> comparing, by the lock interface, the user identity and the code received from the terminal with data stored in the lock interface;
>
> approving the request, by the lock interface, when the user identity and the code received match the data stored in the lock interface, and
>
> rejecting the request, by the lock interface, when at least one of the user identity and the code received does not match the data stored in the lock interface; and
>
> in response to the rejecting of the request, sending, from the lock interface to the terminal, a message indicating that the request is invalid.

'675 Patent at 57:40–58:32. Luxer's complaint alleges that Parcel Pending infringed one or more of the claims of the '675 Patent but discusses only Claim One. Compl. ¶ 20–35.

As the party challenging the '675 Patent, Parcel Pending has the initial burden to make a prima facie showing that the patent claims are "substantially similar and linked to the same" allegedly abstract concept of authorizing access to a secure location upon verification of a user's credentials. Mobile Acuity, 110 F.4th at 1290. In addition to Claim One, the '675 Patent describes six other independent claims: Two, Five, Six, Seven, 19, and 20. '675 Patent at 58:33–60, 59:13–61:23, 62:26–64:23. Parcel Pending contends that the independent claims

"recite only insignificant variants of the claimed system of Claim [One] without providing any distinct or significant difference." Def.'s Br. at 6. In support of its position, Parcel Pending provides a side-by-side comparison of Claim One with each of the independent claims. Id. at 6–7, App'x A. Parcel Pending asserts that "[e]ach independent claim merely adds well-known, conventional components . . . or rewords claim limitations present in Claim [One]," citing Claims Two and 20 as examples. Id. at 7; see '675 Patent at 58:33–60, 63:21–23.

With regard to the remaining dependent claims, Parcel Pending contends that they "add only minor, well-known structural or functional features." Def.'s Br. at 7. As examples of this argument, Parcel Pending asserts that Claim Eight describes the addition of an electronic striker, Claims 12 and 13 describe the addition of storage receptacles within the storage room, and Claims 25 and 26 describe the addition of a capacitive filter. Id.; see '675 Patent at 61:24–28, 61:62–65, 64:46–51. The Court holds that Parcel Pending has made a prima facie showing that the remaining patent claims are "substantially similar and linked to the same" allegedly abstract concept of authorizing access to a secure location upon verification of a user's credentials as Claim One. Mobile Acuity, 110 F.4th at 1290.

The burden now shifts to Luxer to present a non-frivolous argument for why the eligibility of Claim One cannot be fairly treated as representative of all claims.

Id. Luxer argues that treating Claim One as representative fails to account for the specific requirements of the claim. Pl.'s Br. at 16 (citing McRO, Inc. v. Bandai Namco Games Am. Inc. ("McRO"), 837 F.3d 1299, 1313 (Fed. Cir. 2016)). It further contends that the other claims have both physical components and functional requirements that constitute patent-eligible subject matter. Id. As examples, Luxer notes:

> [C]laim [Two] requires "a power source," "a receiver that receives wireless signals . . .[and] transmit[s] signals to the processor," and "one or more capacitors that filter the signals that are transmitted to the processor." Claim [Three] requires a "plurality of electronic locks." Claim [Four] requires "a solenoid that is communicatively coupled to the electronic switch." And independent [C]laim [Five] requires the "electronic lock" to be connected "via electric wires" (as opposed to the "wireless" arrangement recited by [C]laim [Two]).

Id. (quoting '675 Patent at 58:33–59:46.

Though Luxer contends that the physical components and functional requirements recited through the remaining '675 Patent claims constitute patent-eligible subject matter, it has not articulated a reason why they should be differentiated from Claim One for purposes of determining eligibility. Merely providing examples of physical components does not demonstrate why those claims are not "substantially similar" to Claim One or do not relate to the same allegedly patent-ineligible concept. See Mobile Acuity, 110 F.4th at 1290. The Court further notes that Luxer's complaint does not address any of the '675

Patent's claims other than Claim One.  <u>See</u> Compl.  Accordingly, the Court will

consider Count One of the '675 Patent as representative of the other patent claims.

**II.    <u>Alice</u> Step One**

Parcel Pending argues that the '675 Patent claims are not eligible for patent

protection because they are directed to an abstract idea of authorizing access to a

secure location upon verification of a user's credentials.  Def.'s Br. at 2, 8 (citing

<u>Smart Sys. Innovations, LLC v. Chicago Transit. Auth.</u>, 873 F.3d 1364, 1371 (Fed.

Cir. 2017)).

Step one of the <u>Alice</u> analysis requires the court to "determine whether the

claims at issue are directed to a patent-ineligible concept," such as an abstract idea.

<u>Alice</u>, 573 U.S. at 218.  In doing so, the Court considers the claim's "character as a

whole."  <u>Enfish, LLC v. Microsoft Corp.</u>, 822 F.3d 1327, 1335 (Fed. Cir. 2016);

<u>Affinity Labs of Texas, LLC v. DirectTV, LLC</u> ("<u>Affinity Labs</u>"), 838 F.3d 1253,

1257 (Fed. Cir. 2016) ("look at the focus of the claimed advance over the prior art

to determine if the claim's 'character as a whole' is directed to excluded subject

matter.").  Eligible patent claims must "focus on a specific means or method that

improves the relevant technology or are instead directed to a result or effect that

itself is the abstract idea and merely invoke generic processes and machinery."

<u>McRO</u>, 837 F.3d at 1314 (citing <u>Enfish,</u> 822 F.3d at 1336).  They must do more

than break down and organize the steps that humans regularly go through in their

minds when performing tasks.  See In re Jobin, 811 Fed. App'x 633, 637 (Fed. Cir. 2020).

Parcel Pending argues that Claim One, in essence, mirrors the steps taken by an apartment building's concierge in receiving and securing a delivered package. Def.'s Br. at 8–10.  Parcel Pending outlines these steps as to "receive a request to unlock a door; authenticate the user seeking access; approve the request upon authentication; and cause the lock to unlock or indicate that the user failed authentication."  Id. at 8.  Defendant contends that these steps are reflected in the language of Claim One:

> A system comprising:
>
> at least one electronic lock for locking a door of a storage room that is stationary and part of a building.  The storage room being large enough to accommodate packages that are small, medium, and oversized;
> a lock interface that is communicatively coupled to the at least one electronic lock, the lock interface having at least one processor that implements one or more machine instructions stored on at least one non-transitory computer readable medium;
> wherein the one or more machine instructions, when implemented, cause the processor of the lock interface to implement a method including at least
> > *receiving*, at the lock interface from a terminal, *a first signal* associated with a delivery, *requesting access by unlocking the door*;
> > in response, sending from the lock interface to the at least one electronic lock, a second signal including at least a request to open the door;
> > *opening the electronic lock*, based on the request, and allowing the access through the door, regardless of whether a

storage area associated with the door is in use and regardless of whether the package is small, medium, or oversized;

wherein the request includes at least a user identity and a code, wherein the method further includes, after receiving the first signal including the request,

verifying, by the lock interface, the request by *authenticating the user identity* and the code received from the terminal;

*approving the request*, by the lock interface, *after the user identity and the code are successfully authenticated*;

in response to the approving of the request, sending the second signal, from the lock interface to the at least one electronic lock, the second signal *causing the at least one electronic lock to automatically unlock*, the at least one electronic lock including a circuit that includes at least

a signal input port that is communicatively connected to at least one signal output port of the lock interface;

an electronic switch that, in response to the receiving of signals from the lock interface, causes electric current to flow through the at least one electronic lock:

the step of *verifying*, by the lock interface, the request further including at least

*comparing*, by the lock interface, *the user identity and the code received from the terminal with data stored in the lock interface*;

*approving the request*, by the lock interface, when *the user identity and the code received match the data stored in the lock interface*, and

*rejecting the request*, by the lock interface, when at least one of the user identity and the code received does not match the data stored in the lock interface; and

in response to the rejecting of the request, *sending*, from the lock interface to the terminal, *a message indicating that the request is invalid*.

Id. at 9 (emphasis in original) (quoting '675 Patent at 57:40–58:32).  Parcel

Pending also relies on language in the '675 Patent's abstract, stating that: "[i]n an

embodiment, a request for opening a door is received and verified. If the request is

approved, signals are sent to open the electronic lock that locks the door. If the

request is rejected, a message is sent to notify the user of the invalid request." Id.

at 10 (quoting '675 Patent Abstract). As further support for its position that the

'675 Patent claims mirror the human behavior of a concierge, Parcel Pending cites

to Figure 5 of the '675 Patent, which illustrates in a flowchart an embodiment of

the method for implementing the lock system:



FIG. 5

Id. at 10–11; '675 Patent at Fig. 5, 2:16–17.

Claims that essentially automate actions that would normally be performed by the human mind or by a human with pen and paper, such as controlling access to resources, are generally not patentable.  See Ericsson Inc. v. Commc'n Tech. Holdings Ltd. ("Ericsson"), 955 F.3d 1317, 1327 (Fed. Cir. 2020) ("Controlling access to resources is exactly the sort of process that can be performed in the human mind, or by a human using a pen and paper, which we have repeatedly found unpatentable." (internal quotation omitted)).  A similar process of reviewing credentials was considered in Universal Secure Registry, LLC v. Apple Inc., 10 F.4th 1342 (Fed. Cir. 2021).  Universal Secure Registry involved a patent for "a system for authenticating identities of users, including a first handheld device configured to transmit authentication information and a second device configured to receive the authentication information."  Universal Secure Registry, 10 F.4th at 1352–55.  The Universal Secure Registry system was able to use biometric data, passcodes, and other identifying information for verification.  Id. at 1354.  The U.S. Court of Appeals for the Federal Circuit ("CAFC") affirmed the district court's holding that the patent claim was "directed to the abstract idea of secured verification of a person's identity."  Id.  At the trial level, the district court reasoned that the technology was an authentication method based on retrieving and reviewing information.  Id.  The district court and appellate court further noted that the technology did not provide a solution for obtaining, generating, or analyzing

the identification data.  Id. at 1354–55.  Similar to the technology considered in

Universal Secure Registry, Claim One recites a system for accepting personal

identification information, verifying the information by comparing it to available

data, and accepting or rejecting the information with the only additional element

being the unlocking of a door.

Luxer contends that record evidence does not suggest that concierges or

other individuals ever controlled access to storage rooms using signals or codes to

authenticate credentials or employed electronic locks with the specific circuit

components described in Claim One.  Pl.'s Br. at 8–9.  In support of its position

that the process previously used by humans must be the same process recited in the

patent to be ineligible, Luxer offers McRO, Inc. v. Bandai Namco Games America

Inc., 837 F.3d 1299 (Fed. Cir. 2016), and CardioNet, LLC v. InfoBionic, Inc.

("CardioNet"), 955 F.3d 1358 (Fed. Cir. 2020).  Pl.'s Br. at 8–9.  McRO involved

patents relating to the automation of lip synchronization in animation.  McRO, 837

F.3d at 1306–08.  In McRO, the court noted that "defendants provided no evidence

that the process previously used by animators is the same as the process required

by the claims."  Id. at 1314.  CardioNet involved a patent for "cardiac monitoring

systems and techniques for detecting and distinguishing atrial fibrillation and atrial

flutter from other various forms of cardiac arrythmia."  CardioNet, 955 F.3d at

1362–63.  The CardioNet court held that the district court erred in assuming that

the claims were directed to automating a known technique when nothing in the

record supported the finding that doctors had long used the diagnostic processes.

Id. at 1370–71.  McRO and CardioNet are both distinguishable from the current

case in that they involved processes their respective courts recognized to be

different from the existing method and potentially beyond the scope of normal

human capabilities.  See McRO, 837 F.3d at 1315 ("This activity, even if

automated by rules, would not be within the scope of the claims because it does not

evaluate sub-sequences, generate transition parameters or apply transition

parameters to create a final morph weight set.  It is the incorporation of the claimed

rules, not the use of the computer, that 'improved [the] existing technological

process' by allowing the automation of further tasks."); CardioNet, 955 F.3d at

1371 ("[I]t is difficult to fathom how doctors mentally or manually used 'logic to

identify the relevance of the variability [in the beat-to-beat timing] using a non-

linear function of a beat-to-beat interval' as required by claim 10.").  Unlike those

highly technical examples, there is no question that humans are capable and

routinely perform the task of securing areas and verifying credentials in order to

determine if a person is permitted access.  That Claim One performs the task with

computer equipment and signals does not alter the nature of the task performed or

remove the task from the universe of human capabilities.

Luxer argues that Claim One of the '675 Patent is patent-eligible because it describes a machine. Pl.'s Br. at 4–5. To qualify as a machine for purposes of Section 101, "the claimed invention must be a 'concrete thing, consisting of parts, or of certain devices and combination of devices.'" Digitech Image Tech., LLC v. Elec. for Imaging, Inc., 758 F.3d 1344, 1348–49 (Fed. Cir. 2014) (quoting Burr v. Duryee, 68 U.S. 531, 570 (1863)). As Luxer explains in its brief, Claim One references multiple physical components, including:

1. "a *door of a storage room that is stationary and part of a building*,"
2. "at least one electronic lock for locking [the] door" that includes
3. a "circuit,'" which includes "a signal input port," a "signal output port" and "an electronic switch;" and
4. "a lock interface . . . having at least one processor.

Pl.'s Br. at 4 (quoting '675 Patent at 57:42–50, 58:7–14). Luxer is correct in that Claim One describes a machine, but qualifying as a machine is not dispositive of whether a technology is patent-eligible. As the U.S. Supreme Court observed in Alice, that a technology "necessarily exists in the physical rather than the purely conceptual realm is beside the point." Alice, 573 U.S. at 223–24. The relevant initial question for the Court is not whether a technology is tangible, but whether the claim at issue is directed at a patent-ineligible concept, such as a law of nature, natural phenomena, or abstract idea. Id. at 217.

Luxer also attempts to draw a distinction between how courts have analyzed the eligibility of method claims as opposed to system claims.  Pl.'s Br. at 5.  Luxer does not direct the Court to any support for the notion that framing a patent-ineligible concept as a system claim inherently bestows patent-eligibility.  Such a conclusion would be at odds with the U.S. Supreme Court's reasoning in Alice, expressing that, in the context of the claims then before the Court, "the system claims are no different from the method claims in substance.  The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea."  Alice, 573 U.S. at 226.  The Alice Court cautioned that treating the eligibility of system claims and method claims implementing the same concept differently would result in eligibility being dependent on the art of the draftsman, not the content of the claims.  Id. at 226–27.  The Court finds no reason to apply a different analysis to method claims than to system claims merely because system claims involve a tangible aspect.

Luxer further argues that Parcel Pending's argument cherry-picks only a few claimed functions and oversimplifies Claim One.  Pl.'s Br. at 6.  In assessing eligibility, the "[c]ourt must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims."  McRO, 837 F.3d at 1313 (internal quotations omitted).  Luxer has not

explained what specifically is missed by Parcel Pending's alleged overly-simplistic

view.  Considering, for example, the four functions that Luxer identified in its

earlier argument:

1. "a *door of a storage room that is stationary and part of a building*,"
2. "at least one electronic lock for locking [the] door" that includes
3. a "circuit,'" which includes "a signal input port," a "signal output port" and "an electronic switch;" and
4. "a lock interface . . . having at least one processor.

Pl.'s Br. at 4 (quoting '675 Patent at 57:42–50, 58:7–14), Luxer offers no

explanation, beyond its earlier characterizations of the claim as a machine and

system claim, for why those functions are inconsistent with the abstract concept of

authorizing access to a secure location upon verification of a user's credentials.

Luxer argues that Claim One should not be viewed as being directed at an

abstract concept, but at a specific improvement.  Pl.'s Br. at 6–7.  Because

essentially all claims are built in some way upon laws of nature, natural

phenomena, or abstract ideas, Courts have deemed claims directed at a specifically

asserted improvement to be patent-eligible under the first step of the <u>Alice</u>

analysis.  See <u>Enfish</u>, 822 F.3d at 1335–36.  Luxer asserts that Claim One is

directed at resolving the problem of a delivery person being unable to deliver a

package "because the door to the locker of the recipient will not open, because the

locker is in use, the package is oversized and there is no other locker available."

Pl.'s Br. at 6–7.  Luxer indicates that it raised this point before the U.S. Patent and
Trademark Office ("Patent Office").  Id. (citing Pl.'s Br. at Ex. 1 at 69).  Luxer
contends that Claim One's functionality of requiring that "machine instructions
[will] . . . cause the processor of the lock interface to . . . open[] the electronic
lock . . . regardless of whether a storage area associated with the door is in use and
regardless of whether the package is small, medium, or oversized," is directed to
improving upon this problem.  Id. at 7 (quoting '675 Patent at 57:51–64).

        Luxer cites to McRO as an example of when the CAFC found claims to be
directed at a specific improvement and not abstract.  Id. at 8.  The McRO court
found the claim before it to be directed to an improvement in computer animation
because it applied rules to the animation process that allowed the animation of
tasks that were not being previously performed by human animators, such as the
"evaluat[ion] of sub-sequences, generat[ion] of transition parameters, or
applicat[ion] of transition parameters to create a final morph weight set."  McRO,
837 F.3d at 1314.  This is distinguishable from the facts in this case.  Though prior
package storage systems might not have unlocked when occupied or were not able
to accommodate all sizes of packages, a human performing that task would not
have suffered the same limitation.  Claim One does not describe a function beyond
what would be performed by a human concierge.

Luxer also cites to <u>CardioNet</u> as an example of claims directed at improvements. Pl.'s Br. at 9. In determining that the considered patent was directed to an improved method of cardiac monitoring, the <u>CardioNet</u> court considered the language of the claim, the written description, and the dependent claims, all of which were deemed to relate and narrow the focus of the claim to the alleged improvement. <u>CardioNet</u>, 955 F.3d at 1368–69.

At step one of the <u>Alice</u> analysis, the Court considers whether patent claims "*focus* on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." <u>McRO</u>, 837 F.3d at 1314 (emphasis added). Unlike in <u>CardioNet</u>, a holistic reading of Claim One and the '675 Patent does not support that the focus of the claim is on improving access to package storage areas "regardless of whether a storage area associated with the door is in use and regardless of whether the package is small, medium, or oversized." '675 Patent at 57:51–64 The Patent Abstract describes the patent generally as:

> A system and a method for controlling a plurality of electronic locks are provided. In an embodiment, a request for opening a door is received and verified. If the request is approved, signals are sent to open the electronic lock that locks the door. If the request is rejected, a message is sent to notify the user of the invalid request.

'675 Patent Abstract. This description makes no reference to the alleged improvement or the problem it allegedly solves. The majority of Claim One is

similarly focused on a system of locks for securing a door and a system of authenticating user credentials to either allow or deny access. '675 Patent at 57:40–58:32. Considering the character of Claim One as a whole, it cannot be concluded that it is directed to a specific improvement.

For the above discussed reasons, the Court holds that Claim One is directed at an abstract and patent-ineligible concept.

### III.    **Alice Step Two**

Having determined that Claim One concerns an abstract concept, the Court must consider step two of the Alice analysis and determine if the claim provides an "inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." Alice, 573 U.S. at 221 (internal quotation omitted). Step two of Alice requires the Court "to look with more specificity at what the claim elements add, in order to determine whether they identify an 'inventive concept' in the application of the ineligible subject matter to which the claim is directed." Affinity Labs, 838 F.3d at 1258. An inventive concept is "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" Alice, 573 U.S. at 217–18 (quoting Mayo, 566 U.S. at 72–73). It must do more than apply an abstract concept using conventional and well-understood techniques. BSG Tech LLC v. Buyseasons, Inc., 899 F.3d 1281, 1291 (Fed. Cir. 2018). A

claimed enhancement must "add sufficient substance to the underlying abstract idea of enhancement" and serve as "more than a conduit for the abstract idea." <u>Yu v. Apple Inc.</u>, 1 F.4th 1040, 1045 (Fed. Cir. 2021). "[W]hether a combination of claim limitations supplies an inventive concept that renders a claim significantly more than an abstract idea to which it is directed, is a question of law that may be informed by underlying factual determinations." <u>Beteiro, LLC v. DraftKings Inc.</u>, 104 F.4th 1350, 1357 (Fed. Cir. 2024) (internal quotations omitted).

Parcel Pending contends that the '675 Patent claims do not recite an inventive concept. Def.'s Br. at 13–20. Defendant asserts that the claimed functions are "well-understood, routine, conventional activities previously known to the industry." <u>Id.</u> at 13–14 (quoting <u>Alice</u>, 573 U.S. at 225–26). Parcel Pending further argues that the organization of the components of the '675 Patent does not constitute an inventive concept. <u>Id.</u> at 14–15. Luxer counters that whether the '675 Patent is inventive rests on a factual dispute that cannot be resolved at this stage of the litigation and that Parcel Pending has not shown by clear and convincing evidence that the combination of elements in Claim One is conventional. Pl.'s Br. at 11–16.

Defendant summarizes Claim One as:

the "lock interface having at least one processor that implements one or more machine instructions stored on at least one non-transitory computer readable medium" embodies this addition of generic

> functions:  The lock interface, for instance, "receiv[es] . . . a first
> signal"; send[s] . . . a second signal"; "verif[ies] . . . the request by
> authenticating the user identity"; and "open[s] the electronic lock,"
> among other similarly generic procedural steps.

Id. (quoting '675 Patent at 57:46–58:32).  Parcel Pending compares this series of

actions to those taken by a receptionist that verifies a person's credentials before

allowing them access to a secure mailroom or retrieves a package on their behalf.

Id. at 13–14.

Parcel Pending further argues that the components of the '675 Patent,

individually and in combination, do not amount to an inventive concept.  Def.'s Br.

at 14–15.  Luxer contends that Defendant has not proven that the combination of

components of the '675 Patent was conventional because it has failed to cite any

prior-art patent or printed publication that disclosed the claimed components or

their configuration.  Pl.'s Br. at 15–16.  The language of the patent supports that

several of the listed components are well-understood and used in conventional

ways.  For example, the background section states: "[t]ypically, the use of a lock

provides security and privacy to a storage room(s) or a storage area(s).  This

specification recognizes issues in controlling electronic locks."  '675 Patent at

1:51–52.  In describing the locks used in the system, the patent states: "[t]he

electronic locks 103*a-n* may be any sort of locks including, but not limited to, one

of, or any combination of, electronic locks that require a password or code to be

opened, electronic locks having a scanner that requires a particular barcode,

pattern, and/or fingerprint to be scanned to open, electronic locks that receive

instructions via wireless signals (e.g., radio signals, audio signals, etc.)." Id. at

6:18–25.  Luxer attempts to argue that the electronic locks are not conventional

because the language does not recognize the prior existence of electronic locks

with the elements described in Claim One, including a "circuit" with "a signal

input port that is communicatively connected to at least one signal output port of

the lock interface" and "an electronic switch that, in response to the receiving of

signals from the lock interface, causes electric current to flow through the at least

one electronic lock."  Pl.'s Br. at 15 (quoting '675 Patent at 58:10–17).  That the

locks were later configured with other components does not negate Luxer's

admission in the language of the patent that the lock could be "any sort of lock"

and the type that "provides security and privacy" to rooms.  Cf. PharmaStem

Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1362 (Fed. Cir. 2007)

("Admissions in the specification regarding the prior art are binding on the

patentee for purposes of a later inquiry into obviousness.") (citations omitted).

    The system also uses generic components, such as a "door of a storage room

that is stationary and part of a building," "signal," "machine readable medium,"

"keypad," and "processor."  '675 Patent at 9:10–14 ("Lock interface 112 is a

device and/or system that is communicatively connected to each of the electronic

locks 103*a-n*.  In at least one embodiment, the lock interface 112 receives and/or

transmits wireless signals (e.g., WI-FI signals, near field communication signals,

Bluetooth signals, facsimile, audio signals, radio signals, infrared communication

signals, etc.)"); 13:33–34 ("Processor 210 is a processor that controls the electronic

locks 103*a-n*."); 16:59–67 ("Keypad 404 is a keypad that facilitates entering a

password or passcode for unlocking at least one of the electronic locks 103*a-n*.

Keypad 404 may include a touchpad."); 17:26–33 ("The term 'machine-readable

medium' is used to refer to any non-transitory medium capable of carrying

information that is readable by a machine."); see id. at 57:42–58:32.  The general

language used by the '675 Patent indicates that the components are of a

conventional and familiar type.  See Aatrix Software, Inc. v. Green Shades

Software, Inc., 890 F.3d 1354, 1356 (Fed. Cir. 2018) ("In a situation where the

specification admits the additional claim elements are well-understood, routine,

and conventional, it will be difficult, if not impossible, for a patentee to show a

genuine dispute.").

 Luxer contends that, even if the individual components were generic, Parcel

Pending has not shown that their combination was conventional.  Pl.'s Br. at 15–

16.  An inventive concept can take the form of a non-conventional arrangement or

configuration of conventional components.  Basom Global Internet Servs., Inc. v.

AT&T Mobility LLC, 827 F.3d 1341, 1350 (Fed. Cir. 2016).  For an ordered

combination of components to transform an abstract concept into a patentable

design, they must provide something more innovative than what is contributed by

the individual components.  See Alice, 573 U.S. at 225.  In this case, the

components are organized in a logical fashion to allow for a request to be entered

at the lock interface, a signal to be sent to a processor to determine whether the

request is valid, a second signal to be sent to an electronic lock, and for the lock to

unlock in response to the second signal.  The organization described in Claim One

does nothing more than place the abstract idea of controlling access based on the

verification of credentials into a technological environment.  See Mayo, 566 U.S.

at 78 ("[T]he prohibition against patenting abstract ideas cannot be circumvented

by attempting to limit the use of the formula to a particular technological

environment." (internal quotations omitted)).

Luxer contends that it made representations to the Patent Office explaining

why the '675 Patent constitutes an inventive concept over prior art.  Pl.'s Br. at 13.

These representations included a statement that the ability to open the storage room

door regardless of whether a package is oversized, "'is an improvement in the

functioning of the storage facility' because it does not 'forc[e] the delivery person

to return the package' without delivering it."  Id. at 13–14 (quoting id. at Ex. 1 at

69–70).  Luxer asserts that this explanation resulted in the Patent Office

withdrawing its Section 101 rejection of the patent application.  Id. at 14.

The only support that Plaintiff offers for its position that the Court must accept as true statements made to the Patent Office is an unpublished case from 2018, Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc. ("Pacific Biosciences"), 2018 WL 1419082 (D. Del. Mar. 22, 2018). Pl.'s Br. at 3, 11–12. In Pacific Biosciences, the plaintiff alleged in its complaint that the defendant made statements in a parallel litigation before the International Trade Commission conceding that the relevant technology was not known at a particular time. Pacific Biosciences, 2018 WL 1419082, at *7. The Pacific Biosciences court concluded that it was required to accept as true that the statements were made and that doing so made it difficult "to persuade the [c]ourt by clear and convincing evidence that the state of the pertinent art was such that the asserted claims must be found to be nothing more than well-understood, routine, and conventional." Id. Unlike in Pacific Biosciences, Luxer did not raise its representations to the Patent Office in its pleadings. See id. at *7. Because patent eligibility is a matter of law, the Court is not required to afford deference to the determinations of the Patent Office. See Beteiro, 104 F.4th at 1359 ("[A] patent examiner's consideration of Section 101 issues does not in any way shield the patent's claims from Article III review for patent eligibility." (internal quotation omitted)); Sanderling Mgmt. Ltd. v. Snap Inc., 65 F.4th 698, 705 (Fed. Cir. 2023) ("[C]ourts are not required to defer to Patent Office determinations as to eligibility.").

Because Claim One does not recite an inventive concept, the '675 Patent does not pass the second step of the <u>Alice</u> analysis. The Court holds that, drawing all reasonable inferences in favor of Luxer, the '675 Patent is not patent eligible under Section 101.

## CONCLUSION

Upon consideration of Parcel Pending's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6); Luxer's Opposition to Parcel Pending's Motion to Dismiss; Parcel Pending's Reply in Support of Defendant's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6), and all other papers and proceedings in this action, it is hereby

**ORDERED** that Parcel Pending's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (D.I. 16) is granted; and it is further

**ORDERED** that Luxer Corporation's Complaint (Doc. 1) is dismissed.

IT IS SO ORDERED this 6th day of February, 2025.

   /s/ Jennifer Choe-Groves   
Jennifer Choe-Groves
U.S. District Court Judge[*]

---

[*] Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.